IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
WAYCROSS DIVISION

SAMUEL CLIFFORD LASTER,

    Plaintiff,

v.

NANCY A. BERRYHILL, Acting
Commissioner of the Social Security
Administration,[1]

    Defendant.

CIVIL ACTION NO.: 5:16-cv-21

## ORDER and MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

Plaintiff contests the decision of Administrative Law Judge Robert Droker ("the ALJ" or "ALJ Droker") denying his claim for a period of disability, disability insurance benefits, and supplemental security income benefits. Plaintiff urges the Court to reverse the ALJ's decision and award him benefits. Defendant asserts the Commissioner's decision should be affirmed. For the reasons which follow, I **RECOMMEND** the Court **AFFIRM** the Commissioner's decision. I also **RECOMMEND** that the Court **DIRECT** the Clerk of Court to **CLOSE** this case.

## BACKGROUND

Plaintiff protectively filed for a period of disability, disability insurance benefits, and supplemental security income on August 13, 2010, initially alleging disability beginning January 31, 2008. (Doc. 11, pp. 149–54; Doc. 11-1, p. 19.) The state disability determination service denied Plaintiff's application. (Doc. 11, pp. 78–86; 88–90.) Plaintiff amended his alleged onset date to January 1, 2010, (doc. 11-2, p. 151), and an Administrative Law Judge denied his

---

[1] The Clerk of Court is **DIRECTED** to amend the docket and record of this case to reflect the substitution of Nancy A. Berryhill as the Acting Commissioner of the Social Security Administration and as Defendant.

application after a hearing, (id. at pp. 82–94). The Appeals Council granted Plaintiff's request for review of the ALJ's decision and remanded Plaintiff's claim for further consideration. (Id. at pp. 95–99.) The ALJ held a supplemental hearing and issued a decision denying Plaintiff's claim, (doc. 11-5, pp. 5–19), which the Appeals Council again remanded, (id. at pp. 23–25). After a second supplemental hearing, ALJ Droker denied Plaintiff's claim on June 5, 2015. (Doc. 11, pp. 27–59.) The Appeals Council denied Plaintiff's request for review. (Id. at pp. 13–16.)

Plaintiff, born on July 16, 1964, was fifty (50) years old when ALJ Droker issued his final decision. (Id. at p. 149.) He has a tenth grade education. (Doc. 11-6, p. 54.) Plaintiff's past relevant work experience includes employment as a clearing supervisor and heavy equipment operator. (Doc. 11, p. 57.)

## DISCUSSION

### I. The ALJ's Findings

Title II of the Act defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The Act qualifies the definition of disability as follows:

> An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[.]

42 U.S.C. § 423(d)(2)(A). Pursuant to the Act, the Commissioner has established a five-step process to determine whether a person meets the definition of disability. 20 C.F.R. §§ 404.1520 & 416.920; Bowen v. Yuckert, 482 U.S. 137, 140 (1987).

The first step determines if the claimant is engaged in "substantial gainful activity." Id. If the claimant is engaged in substantial gainful activity, then benefits are immediately denied. Id. If the claimant is not engaged in such activity, then the second inquiry is whether the claimant has a medically severe impairment or combination of impairments. Id. at 140–41. If the claimant's impairment or combination of impairments is severe, then the evaluation proceeds to step three. The third step requires a determination of whether the claimant's impairment meets or equals one of the impairments listed in the Code of Federal Regulations and acknowledged by the Commissioner as sufficiently severe to preclude substantial gainful activity. 20 C.F.R. §§ 404.1520(d) & 416.920(d); 20 C.F.R. Pt. 404, Subpt. P. App. 1; Phillips v. Barnhart, 357 F.3d 1232, 1238 (11th Cir. 2004). If the impairment meets or equals one of the listed impairments, the plaintiff is presumed disabled. Yuckert, 482 U.S. at 141.

If the impairment does not meet or equal one of the listed impairments, the sequential evaluation proceeds to the fourth step to determine if the impairment precludes the claimant from performing past relevant work, i.e., whether the claimant has the residual functional capacity to perform his past relevant work. Id.; Stone v. Comm'r of Soc. Sec., 503 F. App'x 692, 693 (11th Cir. 2013). A claimant's residual functional capacity "is an assessment . . . of the claimant's remaining ability to do work despite his impairments." Id. at 693–94 (ellipsis in original) (quoting Lewis v. Callahan, 125 F.3d 1436, 1440 (11th Cir. 1997)).[2] If the claimant is

---

[2] In Barnhart v. Thomas, 540 U.S. 20, 28 (2003), the United States Supreme Court found the fourth step of the Social Security Administration's ("SSA") five-step evaluation process to be a reasonable construction of 42 U.S.C. § 423(d)(1)(A)'s definition of disability. In Barnhart, the Third Circuit Court of Appeals disapproved of the fourth step. Specifically, the Third Circuit construed Section 423(d)(1)(A)

3

unable to perform her past relevant work, the final step of the evaluation process determines whether she is able to make adjustments to other work in the national economy, considering her age, education, and work experience. Phillips, 357 F.3d at 1239. Disability benefits will be awarded only if the claimant is unable to perform other work. Yuckert, 482 U.S. at 142.

In the instant case, ALJ Droker followed this sequential process to determine that Plaintiff did not engage in substantial gainful activity during the period from his alleged onset date of January 1, 2010, through the date of ALJ Droker's decision on June 5, 2015. (Doc. 11, p. 32.) At Step Two, the ALJ determined that Plaintiff had diabetes mellitus with neuropathy, obesity, hypertension, lumbar degenerative disc disease, vision impairment, right elbow epicondylitis, and right knee impairment, conditions considered "severe" under the Regulations.[3] (Id.) However, the ALJ determined that Plaintiff's medically determinable impairments did not meet or medically equal a listed impairment.[4] (Id. at p. 36.) ALJ Droker found that Plaintiff had the residual functional capacity, through the date of his decision, to perform work at the light

---

to require that a claimant's previous work to be "substantial gainful work which exists in the national economy" in order to disqualify the claimant from receiving benefits. Barnhart, 540 U.S. at 23. The Supreme Court reversed the Third Circuit and held that the SSA reasonably interpreted the phrase "substantial gainful work which exists in the national economy" to only modify "other" work (i.e., work other than the claimant's previous work). Id. In reaching this conclusion, the Supreme Court afforded deference to SSA's statutory interpretation pursuant to Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 843 (1984). Id. at 26–29. The soundness of Chevron deference has been repeatedly questioned. See, e.g., Michigan v. EPA, ___ U.S. ___, 135 S. Ct. 2699, 2712–14 (June 29, 2015) (Thomas, J., concurring). However, the doctrine still stands as binding precedent that this Court must follow. Moreover, the Supreme Court's decision in Barnhart rested on textual rules of statutory interpretation, including the "rule of the last antecedent." 540 U.S. at 26–28. Thus, it appears that, even without resorting to atextual rules of construction, including Chevron deference, the SSA's five-step process comports with Congress' definition of disability.

[3] ALJ Droker determined that Plaintiff's right metacarpal fracture, right thyroid mass, and anxiety did not cause more than a minimal limitation in Plaintiff's ability to perform basic work activities and were, therefore, non-severe impairments. (Doc. 11, pp. 33–36.)

[4] ALJ Droker specifically noted Plaintiff did not meet Listing 1.00 (musculoskeletal disorders), Listing 2.00 (special senses or speech), Listing 4.00 (cardiovascular system), Listing 9.00 (endocrine system), or Listing 11.00 (neurological) because "no treating or examining physicians reported findings that satisfy the criteria of any of [those] listed impairments." (Doc. 11, p. 36.)

exertional level, with the following exceptions: plaintiff needs a sit/stand option; needs to avoid ladders or unprotected heights; needs to avoid the operation of heavy, moving machinery; can occasionally bend, crouch, kneel, or stoop; needs to avoid squatting or crawling; needs good lighting; and needs to avoid the operation of foot controls. (Id.) At the next step, ALJ Droker concluded that Plaintiff was unable to perform his past relevant work as a clearing supervisor and heavy equipment operator. (Id. at p. 57.) The ALJ concluded at the fifth and final step that Plaintiff could perform the jobs of cashier II, ticket seller, addresser, and call out operator, all of which are light, unskilled jobs which exist in significant numbers in the national economy. (Id. at p. 58.)

## II.  Issue Presented

Plaintiff contends the ALJ's residual functional capacity ("RFC") and credibility determinations are not supported by substantial evidence. (Doc. 13, p. 1.) Specifically, as to the RFC determination, Plaintiff argues that the ALJ erred by relying solely upon the opinion of a non-examining physician.

## III.  Standard of Review

It is well-established that judicial review of social security cases is limited to questions of whether the Commissioner's factual findings are supported by "substantial evidence," and whether the Commissioner has applied appropriate legal standards. Cornelius v. Sullivan, 936 F.2d 1143, 1145 (11th Cir. 1991); Martin v. Sullivan, 894 F.2d 1520, 1529 (11th Cir. 1990). A reviewing court does not "decide facts anew, reweigh the evidence or substitute" its judgment for that of the Commissioner. Dyer v. Barnhart, 395 F.3d 1206, 1210 (11th Cir. 2005). Even if the evidence preponderates against the Commissioner's factual findings, the court must affirm a decision supported by substantial evidence. Id.

However, substantial evidence must do more than create a suspicion of the existence of the fact to be proved. The evidence relied upon must be relevant evidence which a reasonable mind would find adequate to support a conclusion. Ingram v. Comm'r of Soc. Sec. Admin., 496 F. 3d 1253, 1260 (11th Cir. 2007). The substantial evidence standard requires more than a scintilla but less than a preponderance of evidence. Dyer, 395 F.3d at 1210. In its review, the court must also determine whether the ALJ or Commissioner applied appropriate legal standards. Failure to delineate and apply the appropriate standards mandates that the findings be vacated and remanded for clarification. Cornelius, 936 F.2d at 1146.

## IV. Whether Substantial Evidence Supports ALJ Droker's Residual Functional Capacity Finding

Plaintiff asserts the ALJ erred by determining Plaintiff has the RFC to perform a limited range of light work. First, Plaintiff avers ALJ Droker improperly gave great weight to State Agency medical consultant Dr. Donald Morford's opinion, because that opinion was rendered on February 18, 2011, "well prior to the majority of the treatment which [Plaintiff] received for his impairments." (Doc. 13, p. 11.) Plaintiff maintains that the ALJ's reliance on this single opinion by a non-examining physician cannot constitute substantial evidence for his RFC determination. Second, Plaintiff contends the ALJ rejected the portion of Dr. Morford's opinion regarding Plaintiff's walking and standing limitations, yet failed to provide an explanation for doing so. (Id.) Relatedly, Plaintiff contends the ALJ found Plaintiff had severe right knee and elbow impairments, yet failed to incorporate these severe impairments into Plaintiff's RFC determination. (Id. at p. 12.) Finally, Plaintiff argues "the ALJ failed to explain how the treatment [Plaintiff] received or his reported daily activities were inconsistent with his allegations of an inability to work" and mischaracterized those activities. (Id. at pp. 14–15.)

Defendant contends substantial evidence supports the ALJ's RFC determination and the weight the ALJ assigned Dr. Morford's opinion. (Doc. 14, p. 4.) In addition, Defendant contends the ALJ adequately explained his assessment of Plaintiff's RFC and Dr. Morford's opinion and properly relied upon that opinion, even though Dr. Morford did not see Plaintiff's entire medical record. (Id. at p. 5.) Finally, Defendant avers the ALJ adequately explained how Plaintiff's treatment history and daily activities supported Dr. Morford's opinion and the ALJ's RFC assessment. (Id. at p. 9.)

"An RFC determination is an assessment, based on all relevant evidence, of a claimant's remaining ability to do work despite [his] impairments." Packer v. Comm'r, Soc. Sec. Admin., 542 F. App'x 890, 891 (11th Cir. 2013) (citing Lewis v. Callahan, 125 F.3d 1436, 1440 (11th Cir. 1997)). "There is no rigid requirement that the ALJ specifically refer to every piece of evidence, so long as the ALJ's decision is not a broad rejection, i.e., where the ALJ does not provide enough reasoning for a reviewing court to conclude that the ALJ considered the claimant's medical condition as a whole." Id. at 891–92 (citing Dyer v. Barnhart, 395 F.3d 1206, 1211 (11th Cir. 2005)). However, an RFC assessment must always consider and address medical source opinions. If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted. Soc. Sec. Ruling 96-8p. "An ALJ is not entitled to pick and choose through a medical opinion, taking only the parts that are favorable to a finding of nondisability." Kerwin v. Astrue, 244 F. App'x 880, 885 (10th Cir. 2007). The final determination of a plaintiff's RFC is reserved to the Commissioner. 20 C.F.R. §§ 404.1527(d) & (e)(2).

In finding that Plaintiff had the RFC to perform a limited range of light work, the ALJ stated he considered all symptoms and the extent those symptoms could reasonably be accepted

as consistent with the objective medical evidence and other evidence of record. (Doc. 11, p. 36.) As discussed below, the ALJ methodically discussed the medical evidence underlying each of Plaintiff's severe impairments and explained how the intensity of each of these impairments affected the ALJ's RFC determination. Therefore, upon review of the record and of the ALJ's decision, it is apparent the ALJ considered Plaintiff's medical condition as a whole when making his RFC determination and that substantial evidence supports that determination.

First, as to Plaintiff's diabetes and neuropathy, the ALJ looked to Plaintiff's treatment records and noted that Plaintiff's diabetes was generally under fair to suboptimal control. (Id. at pp. 40-49). However, the ALJ noted that Plaintiff's "more recent treatment records indicate improved control of his diabetes[.]" (Id. at p. 52). Indeed, throughout his decision, the ALJ discussed Plaintiff's reported glucose levels and noted a sustained drop in those levels in 2013. (Id. at pp. 46–49.) In addition, the ALJ noted that, while "there were periods in 2011 and 2012 where the [Plaintiff's] examinations revealed impaired sensation to superficial touch, . . . his neurological examinations have revealed intact sensation" since January 2012. (Id. at p. 52) The ALJ explained further that, "[e]ven when [Plaintiff's] examinations revealed impaired sensation, his circulation, gait, balance, coordination, and strength remained intact[.]" (Id.)

As to Plaintiff's hypertension, the ALJ observed that this impairment is "under at least fair control on [Plaintiff's] medication regimen with no evidence of end-organ damage[.]" (Id.) In addition, the ALJ noted that Plaintiff "repeatedly denied cardiovascular symptoms at his primary care visits," and that his cardiovascular examinations with his treating physicians were normal, as was his cardiovascular examination with Dr. Morford. (Id.) While the ALJ acknowledged that Plaintiff sought treatment for chest pain and shortness of breath on various occasions from January 2011 through July 2013 and presented to the emergency room with that

particular complaint on at least one occasion, his cardiovascular examinations returned normal results. (Id. at pp. 52–53.) Moreover, the ALJ found that Plaintiff denied cardiovascular symptoms at emergency room and urgent care visits in January and July 2013, and at an August 2014 emergency room visit, his cardiovascular examination revealed a regular rate and rhythm. (Id. at p. 53.)

As to Plaintiff's lumbar degenerative disc disease, the ALJ observed that, while some examinations performed by Plaintiff's treating physicians "revealed tenderness to palpitation of the lumbosacral spine with muscle spasms and reduced range of motion," other musculoskeletal examinations returned normal results. (Id.) In addition, the ALJ noted neurological examinations by Plaintiff's treating physicians "show grossly normal motor function" and that Plaintiff "denied a gait disturbance related to his back pain" and repeatedly denied muscle loss, myalgias, bone/joint symptoms, and weakness. (Id.) The ALJ further noted that, while Plaintiff reported impaired sensation in 2011 and early 2012, "his subsequent examinations consistently revealed intact sensation[.]" (Id.) Moreover, the ALJ explained that "even when [Plaintiff's] examinations revealed impaired sensation, his circulation, gait, balance, coordination, and strength remained intact[.]" (Id.) In addition, the ALJ found that the examination findings of both Dr. Luiz M. Massa and consultative examiner Dr. Hung V. Tran were inconsistent with a disabling lumbar spine impairment. (Id.) Specifically, the ALJ stated that, "[a]lthough the [plaintiff] had muscle spasms and decreased range of motion of his lumbar spine with pain, his gait, coordination, strength, and muscle tone were normal with no evidence of atrophy." (Id.) The ALJ further noted that an EMG/NCS Dr. Massa ordered "showed only mild axonal distal sensory motor peripheral neuropathy with normal monofilament sensation and propria reception at the feet[,]" and that "[e]mergency room examinations during the period at issue also revealed

intact strength, motor functioning, sensation, and coordination[.]" (Id.) The ALJ stated that, "on several occasions, [Plaintiff's] musculoskeletal examinations revealed normal range of motion with no tenderness or swelling" and that the "consultative examination findings were also within normal limits except for the pain in the lumbar spine[.]" (Id.) Relying upon this medical evidence, the ALJ concluded that Plaintiff could perform light work with either a sit or stand option to perform the task assigned, provided Plaintiff avoided ladders, unprotected heights, operation of heavy, moving machinery, squatting, and crawling.

As to Plaintiff's right knee impairment, the ALJ noted that Plaintiff has a history of right knee impairment and occasionally received treatment for that impairment from 2011 through 2014. (Id. at p. 54.) Specifically, the ALJ acknowledged that Plaintiff: complained of right knee pain with radiation into the foot in 2011; complained of gradually worsening knee pain in 2012 and received an injection; and underwent surgery for right knee bursitis in May 2014. (Id.) Nevertheless, the ALJ observed that, despite the presence of this knee condition, Plaintiff "denied muscle weakness," "his gait, balance, and coordination have remained intact," and he was released from knee surgery "without limitation" on June 30, 2014. (Id.) The ALJ then stated he "accounted for the limitations from . . . [Plaintiff's] right knee impairment by limiting him to light work with the ability to sit or stand at his option to perform the tasks assigned" and determining that Plaintiff should avoid ladders or unprotected heights, the operation of heavy, moving machinery, squatting, crawling, and the operation of foot controls. (Id.)

As to Plaintiff's right elbow impairment, the ALJ noted Plaintiff sought treatment for right elbow pain in February 2012, received medications and injections, and was advised to use an arm sling and ice/heat to alleviate pain. (Id.) However, the ALJ also noted that Plaintiff had normal strength and grip strength in his upper extremities. Accordingly, the ALJ limited

Plaintiff to light work to account for the remaining symptoms related to Plaintiff's right elbow pain.[5]

As to Plaintiff's vision impairment, the ALJ observed Plaintiff "consistently denied vision loss and blurred vision" to his primary care providers. Although Plaintiff did complain of blurred vision on one occasion in October 2012, that episode was attributed to a headache. (Id.) Plaintiff's eye examination following his complaint was normal. (Id.) Plaintiff also denied vision changes and blurred vision at urgent care and emergency room visits. (Id.) In 2012, a consultative examiner determined Plaintiff's vision was 20/50 in his right eye and 20/40 in his left eye but only advised that Plaintiff obtain reading glasses. (Id.) The ALJ further noted Plaintiff's testimony at the hearing that he drives approximately 200 miles per month, despite his vision impairment. (Id.) Based upon these observations, the ALJ "accounted for this impairment by finding that [Plaintiff] needs to work in an environment with good lighting." (Id.)

As to Plaintiff's obesity, the ALJ stated that Plaintiff's "examinations have shown normal strength in the upper and lower extremities, normal coordination, and generally a normal gait without the use of an assistive device" despite his obesity. (Id. at pp. 54–55.) After noting that

---

[5] Plaintiff's argument that the ALJ failed to incorporate Plaintiff's right knee and right elbow impairments into the RFC determination are without merit. The ALJ clearly did so within the body of his decision, as noted herein. To reiterate, as to Plaintiff's knee impairment, the ALJ limited Plaintiff to light work with the ability to sit or stand at his option and determined that Plaintiff should avoid ladders or unprotected heights, the operation of heavy, moving machinery, squatting, crawling, and the operation of foot controls. (Doc. 11, p. 54.) As to Plaintiff's elbow impairment, the ALJ noted Plaintiff had normal strength and grip strength and that Plaintiff's treatment regimen had eliminated some of his symptoms. (Id.) The ALJ cited to objective medical evidence concerning the treatment and severity of Plaintiff's knee and elbow impairments and then concluded that Plaintiff could perform limited light work based upon that evidence. Moreover, "[a] conclusion that an impairment is 'severe' for the purposes of step two of the enquiry does not dictate the outcome at step four." Ybarra v. Comm'r of Soc. Sec., 658 F. App'x 538, 541–42 (11th Cir. 2016) (citing Moore v. Barnhart, 405 F.3d 1208, 1213 n.6 (11th Cir. 2005) ("[T]he mere existence of [severe] impairments does not reveal the extent to which they limit [the] ability to work or undermine the ALJ's determination[.]")). Here, the ALJ noted that Plaintiff's right elbow epicondylitis and right knee impairment were severe impairments, yet found that those impairments did not prevent him from performing light work. The ALJ thoroughly explained his reasoning, and his determination is supported by substantial evidence. Accordingly, Plaintiff's argument fails.

11

Plaintiff had reduced his body mass index ("BMI") through diet and exercise, the ALJ then concluded that "the limitations from [Plaintiff's] obesity would not prevent him from performing the range of light work activity described in his residual functional capacity determination."

In addition to examining and discussing specific medical evidence as to each of Plaintiff's severe impairments, the ALJ also considered and discussed "other evidence in accordance with the regulations." (Id. at p. 55.) First, the ALJ noted that Plaintiff "has not required emergency room visits or hospitalizations for hypertensive emergencies or uncontrolled diabetes" and that Plaintiff's "treatment regimen for his musculoskeletal and neurological impairments generally has been conservative in nature and has consisted of prescribed medications, injective therapy, an arm sling, and the use of ice/heat[.]" (Id.) The ALJ further noted that, although Plaintiff was scheduled for back surgery and occasionally used a walking cane, the medical evidence did not indicate Plaintiff was prescribed back surgery or the use of a cane. (Id.) These factors, along with Plaintiff's failure to consistently adhere to his treatment plans and his ability to engage in multiple activities of daily living, contributed to the ALJ's determination that Plaintiff could "perform a light range of exertional work." (Id. at p. 56.)

The ALJ's determination that Plaintiff maintained the RFC to perform a limited range of light work is supported by substantial evidence. As laid out above, ALJ Droker looked at the objective medical and other evidence of record, meticulously explained his analysis of that evidence as to each of Plaintiff's severe impairments, and then explained how the evidence impacted his RFC determination. Plaintiff's enumeration of error is, therefore, without merit. Relatedly, substantial evidence also supports the ALJ's attribution of "great weight" to State agency medical consultant Dr. Morford's opinion. After extensively discussing the objective

medical evidence, the ALJ then explained how that examiner's opinion was consistent with that objective medical evidence. Accordingly, this enumeration of error is also without merit.[6]

Similarly, Plaintiff's contention that the ALJ erred by rejecting the portion of Dr. Morford's opinion regarding Plaintiff's walking and standing limitations without providing an explanation for that rejection is without merit. Dr. Morford opined that Plaintiff could perform a job requiring that he stand or walk for at least two (2) hours. (Doc. 11-1, p. 171.) The ALJ determined Plaintiff had the RFC to perform light work but needed an option to sit or stand at his will due to his limitations. (Doc. 11, p. 36.) Accordingly, the ALJ's determination was more restrictive than Dr. Morford's determination, which benefitted Plaintiff. The ALJ adequately explained the reasoning behind his RFC determination, and his conclusion as to Plaintiff's ability to sit or stand is supported by substantial evidence.

Finally, Plaintiff contends the ALJ mischaracterized Plaintiff's daily activities and failed to explain how those activities indicated that Plaintiff could work. Contrary to Plaintiff's contention, the ALJ cited Plaintiff's hearing testimony regarding his daily activities and, based upon those activities, concluded that Plaintiff could perform a limited range of light work. The ALJ cited multiple activities reported by Plaintiff, such as caring for his personal needs, walking his dogs, going to church, and driving a "couple of hundred miles per month[.]" (Doc. 11, p. 56.) Plaintiff's hearing testimony serves as substantial evidence that he could perform a limited range of light work. The ALJ adequately connected Plaintiff's daily activities to his RFC

---

[6] Similarly, Plaintiff's argument that the ALJ's RFC determination is erroneous because "the opinions of non-examining, reviewing physicians . . . do not, 'taken alone, constitute substantial evidence'" is misplaced. (Doc. 13, pp. 11–12.) The ALJ did not rely solely upon Dr. Morford's opinion to support his RFC determination. As discussed above, the ALJ cited substantial evidence directly from the medical record to support his conclusion. Only after doing so did the ALJ attribute great weight to Dr. Morford's opinion and rely additionally upon that opinion in support of his RFC determination.

determination, and it does not appear that he misreported Plaintiff's testimony. Accordingly, the ALJ did not err in this determination.

For all these reasons, the ALJ's RFC determination is supported by substantial evidence. Therefore, the Court should **AFFIRM** the Commissioner's decision on this basis.

## V. The ALJ's Credibility Determination

Next, Plaintiff argues that ALJ Droker erred by improperly discrediting Plaintiff's testimony regarding his subjective complaints of pain. (Doc. 13, p. 16.) Specifically, Plaintiff contends ALJ Droker ignored evidence that Plaintiff continued to seek treatment for his medical issues, as that evidence contradicted the ALJ's conclusion to the contrary. (Id. at pp. 17–18.) In addition, Plaintiff contends the ALJ did not adequately explain how Plaintiff's daily activities were inconsistent with Plaintiff's allegation of disability. (Id. at p. 18.) Finally, Plaintiff avers ALJ Droker mischaracterized Plaintiff's work history and failed to explain how that work history impacted his credibility. (Id.)

Defendant argues that substantial evidence supports ALJ Droker's credibility determination. Specifically, Defendant contends the ALJ cited to objective medical evidence, the type of treatment Plaintiff received, Plaintiff's non-compliance with medications, his reported daily activities, and his history of low earnings prior to the period of alleged disability in making his determination. (Doc. 14, p. 11.) Defendant contends that the ALJ adequately explained the reasoning behind his credibility determination in his discussion of this evidence.

"If a plaintiff testifies as to his subjective complaints of disabling pain and other symptoms, . . . the ALJ must clearly 'articulate explicit and adequate reasons' for discrediting the claimant's allegations of completely disabling symptoms." Dyer, 395 F.3d at 1210 (quoting Foote v. Chater, 67 F.3d 1553, 1561–62 (11th Cir. 1995)). An ALJ's credibility determination

need not "cite 'particular phrases or formulations'[,] but it cannot merely be a broad rejection which is 'not enough to enable [a reviewing court] to conclude that [the ALJ] considered [a plaintiff's] medical condition as a whole.'" Id. at 1210–11 (quoting Foote, 67 F.3d at 1561).

Review of ALJ Droker's decision reveals that he considered Plaintiff's medical condition as a whole and clearly articulated the reasons behind his credibility determination. First, as to the intensity, persistence, and limiting effects of Plaintiff's diabetes, ALJ Droker discussed at length the disparity between Plaintiff's testimony and the most recent objective medical evidence. (Doc. 11, p. 52.) For example, the ALJ noted that, while Plaintiff had a history of only fair to suboptimal control of his diabetes, "his neurological examinations have consistently revealed intact sensation" since January 2012, "his circulation, gait, balance, coordination, and strength remained intact," and there was "no evidence of end-organ damage . . . [or] diabetic retinopathy[.]" (Id.) The ALJ further noted Plaintiff "denied heat and cold intolerance, hypoglycemic episodes, polydipsia, polyphagia, dysesthesias, burning of the extremities, tingling in his legs, foot ulcers, or slow-healing wounds or sores" in relation to his diabetes. (Id.) Moreover, as to Plaintiff's testimony that he experiences hand numbness as a result of diabetes, the ALJ noted that Plaintiff is able to use his hands to pick up coins, hold onto a steering wheel, operate a gearshift, and hold cigarettes—all activities requiring Plaintiff to grasp small objects. (Id.) Finally, ALJ Droker noted that, although Plaintiff testified he experienced exacerbated numbness due to cold weather, Plaintiff "repeatedly denied cold intolerance to his treating sources." (Id.)

Similarly, as to Plaintiff's vison loss, the ALJ cited objective medical evidence contradicting Plaintiff's testimony that his vision is "[g]etting really, really, really, really bad." (Doc. 11-6, p. 127.) First, the ALJ noted that Plaintiff "consistently denied vision loss and

blurred vision" to his primary care physicians and that his eye examination returned normal results on the one occasion Plaintiff complained of blurred vision. (Doc. 11, p. 54.) The ALJ further noted that Plaintiff's corrected vision as of March 2012 was 20/50 on the right, 20/40 on the left, and 20/30 OU and that Plaintiff continued to drive approximately 200 miles per month through the date of his hearing, despite his claim of rapid vision loss. (Id.) While the ALJ acknowledged that Plaintiff was diagnosed with "unexplained vision loss" and did not drive at night, ALJ Droker concluded that Plaintiff's vision loss did not rise to the level which Plaintiff testified at the hearing.

The ALJ also found that Plaintiff's testimony regarding the disabling effects of his medications was "inconsistent with his treatment records." (Id. at p. 55.) For example, although Plaintiff testified that his medications caused fatigue and headaches, the ALJ noted that Plaintiff denied experiencing fatigue to treating physicians. (Id.) Moreover, the ALJ found that Plaintiff testified he was scheduled for back surgery and used a cane to walk, yet his treatment records did not indicate that any medical provider prescribed back surgery or the use of a cane. (Id.) In addition, the ALJ found that Plaintiff's "gait was normal on most examinations and he did not require the use of an assistive device for ambulation," contradicting Plaintiff's testimony to the contrary. (Id.)

Additionally, the ALJ observed that Plaintiff "has not always been compliant with recommended treatment." (Id.) Specifically, Plaintiff has disregarded advice from healthcare providers to stop smoking, and he has not consistently treated his hypertension or regularly checked his blood sugar.[7] Finally, the ALJ found that Plaintiff's daily living activities and

---

[7] In finding that Plaintiff failed to consistently seek treatment, the ALJ noted that Plaintiff had access to indigent treatment and to financial assistance from his church, in response to Plaintiff's testimony that he could not afford medical care. Plaintiff argues that the ALJ erred by determining that Plaintiff's lack of consistent treatment undermined his credibility in this instance. Even if the ALJ misconstrued Plaintiff's

16

earnings record weigh against Plaintiff's credibility as to his debilitating symptoms. For example, Plaintiff was able to, *inter alia*, visit relatives, walk his two dogs, go to church most Sundays, drive two-hundred miles per month, and reported in 2011 that he "exercised regularly." (Id. at p. 56.) Furthermore, Plaintiff testified that he stopped working in 2007 or 2008 due, in part, to economic instability. The ALJ found that Plaintiff's sparse history of earnings prior to his alleged onset date weighed against Plaintiff's testimony that his symptoms had prevented him from working, as opposed to the economy or alternate reasons. (Id.)

Credibility determinations are the province of the ALJ, and the Court will not disturb a clearly articulated credibility finding absent substantial evidence. Mitchell v. Comm'r, Soc. Sec. Admin., 771 F.3d 780, 782 (11th Cir. 2014). As laid out above, the ALJ thoroughly discussed Plaintiff's medical records, daily living activities, and other record evidence, and he referenced this information throughout his credibility determination. A review of the ALJ's decision and the record evidence reveals that ALJ Droker clearly articulated the reasons behind his credibility determination and substantial evidence supports that determination. This enumeration of error is, therefore, without merit.

## CONCLUSION

Based on the foregoing, I **RECOMMEND** that the Court **AFFIRM** the decision of the Commissioner. I also **RECOMMEND** that the Court **DIRECT** the Clerk of Court to **CLOSE** this case.

The Court **ORDERS** any party seeking to object to this Report and Recommendation to file specific written objections within **fourteen (14) days** of the date on which this Report and

---

failure to seek treatment in this instance as an indication that Plaintiff was not disabled, the ALJ's ultimate conclusion is supported by substantial evidence, for the reasons discussed in this Report and Recommendation. Accordingly, any error by the ALJ in this instance was harmless. See Wilson v. Comm'r of Soc. Sec., 500 F. App'x 857, 859–60 (11th Cir. 2012).

Recommendation is entered. Any objections asserting that the Magistrate Judge failed to address any contention raised in the pleading must also be included. Failure to do so will bar any later challenge or review of the factual findings or legal conclusions of the Magistrate Judge. See 28 U.S.C. § 636(b)(1)(C); Thomas v. Arn, 474 U.S. 140 (1985). A copy of the objections must be served upon all other parties to the action.

The filing of objections is not a proper vehicle through which to make new allegations or present additional evidence. Upon receipt of objections meeting the specificity requirement set out above, a United States District Judge will make a *de novo* determination of those portions of the report, proposed findings, or recommendation to which objection is made and may accept, reject, or modify in whole or in part, the findings or recommendations made by the Magistrate Judge. Objections not meeting the specificity requirement set out above will not be considered by a District Judge. A party may not appeal a Magistrate Judge's report and recommendation directly to the United States Court of Appeals for the Eleventh Circuit. Appeals may be made only from a final judgment entered by or at the direction of a District Judge. The Court **DIRECTS** the Clerk of Court to serve a copy of this Report and Recommendation upon the parties.

**SO ORDERED** and **REPORTED and RECOMMENDED**, this 30th day of August, 2017.

R. STAN BAKER
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF GEORGIA

18